IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BELL ATLANTIC-MARYLAND, INC. | : | |
| | : | |
| v. | : | CIVIL NO. CCB-98-4187 |
| | : | |
| PRINCE GEORGE'S COUNTY, | : | |
| MARYLAND, et al. | : | |
| | : | |

...o0o...
**MEMORANDUM**

In this case, plaintiff Bell Atlantic-Maryland, Inc. ("Bell

Atlantic")[1] has challenged the validity of defendant Prince

George's County ("the County") ordinance CB-98-1998 ("the

ordinance") which seeks to regulate the use of County rights of

way by telecommunications companies. Bell Atlantic filed its

complaint in 1998, asserting a variety of federal and state

constitutional and statutory claims. In its 1999 opinion, this

court found that the ordinance was preempted by the Federal

Telecommunications Act ("FTA"), 47 U.S.C. § 251, et seq. See

Bell Atlantic-Maryland, Inc. v. Prince George's County, Maryland,

49 F. Supp.2d 805 (D. Md. 1999). The Fourth Circuit Court of

Appeals vacated that opinion and remanded the case with

directions to consider the Maryland state law claims before

evaluating any federal constitutional issues. See Bell Atlantic-

Maryland, Inc. v. Prince George's County, Maryland, 212 F.3d 863

_____

Bell Atlantic-Maryland, Inc. is now known as Verizon-
Maryland, Inc.

1

(4th Cir. 2000). Currently pending are a motion by the County to
dismiss the complaint and a counter motion by Bell Atlantic for
judgment on the pleadings.[2]  Oral argument was held on December
15, 2000. Correspondence from both parties has been received as
recently as July 13, 2001, but will not be relied on in
connection with this opinion. For the reasons provided below,
the court will grant Bell Atlantic's motion for judgment on the
pleadings and issue an injunction permanently enjoining the
County from enforcing the ordinance. Accordingly, the court will
deny the defendant's motion to dismiss. Bell Atlantic's request
for damages, attorneys' fees, and costs will be denied.

## BACKGROUND

The court's original opinion describes in detail the
provisions of the County's telecommunications law and the
relationship between the parties. In order to provide a complete
record and a background sufficient to understand Bell Atlantic's
challenges to the ordinance, that explanation is repeated here.

Bell Atlantic is a Maryland corporation that provides
telephone services to individuals, businesses, and governments in
Prince George's County and throughout Maryland. As the incumbent

_____

[2]The parties have agreed that this matter can be resolved in
its entirety on the present motions. The court, therefore,
considers Bell Atlantic's motion pursuant to Fed. R. Civ. P.
12(c) at this time.

2

local exchange carrier for Prince George's County, Bell Atlantic
has constructed and continues to construct a network of telephone
lines and related facilities needed to provide telephone services
in the county.  These lines and facilities use the County's
public rights-of-way.  (See Compl. ¶¶ 2, 5, 18.)  The County is a
Maryland home-rule county, having adopted a charter form of
government in 1970.  (Compl. ¶ 3.)  As such, the County has been
authorized by the state legislature to exercise all of the powers
set forth in Article 25A, section 5, of the Annotated Code of
Maryland of 1957.

## I.  The Ordinance

In the fall of 1998, the county council passed, and the
county executive signed into law, Prince George's County
ordinance CB-98-1998, entitled "An Act concerning
Telecommunications Franchises for the Use of Public Property and
Public Rights-of-way in the County."³  The ordinance declares
that no person shall

   construct, operate, replace, reconstruct or maintain a
   telecommunications system on, over, or under any public
   rights-of-way in . . . the County without a franchise
   granted by the County to provide telecommunications
   services within the County.

Sec. 5A-151(a).  The County's "franchise" requirement applies
equally to telephone services providers, like Bell Atlantic,

---

³   For the complete text of the law, see Compl., Ex. 6.

which own and operate their own telephone lines and facilities,[4] and telecommunications companies which provide services through lines and facilities owned and maintained by others.[5]  Further, the franchise requirement covers both existing and future lines and facilities.[6]  Failure to obtain a franchise before using the County's public rights-of-way may subject a telecommunications company to "the immediate revocation of any existing permits, licenses or franchises issued by the County . . .."  Sec. 5A-159(c).  In addition, the County "may order prompt removal" of the company's existing lines and facilities "at the [company's] expense."  Id.

In order to obtain a franchise from the County, the ordinance requires a telecommunications company to complete an application form providing the following information:

(1)  The name, address, telephone and facsimile number of the applicant;

---

[4]  See Sec. 5A-151(b) ("A person shall obtain a franchise, subject to the provisions of this Division[,] for any telecommunications system that occupies one or more portions of public property and/or the public rights-of-way").

[5]  See Sec. 5A-151(e) ("No person shall provide a telecommunications service through facilities owned, maintained or operated by any party upon, across, beneath, or over any public right-of-way in the County without obtaining a franchise therefor pursuant to the provisions of this Division").

[6]  See Sec. 5A-159(a) ("The provisions of this Division shall apply to all telecommunications transmission systems either installed or under construction within the County as of the effective date of this Division or thereafter installed or constructed").

4

(2)   The name, address and telephone number of a responsible person whom the County may notify or contact at any time concerning the applicant's telecommunications system;

(3)   An engineering site plan showing the proposed location of the telecommunications system, including any manholes or overhead poles, the size, type and proposed depth of any conduit or other enclosures, the relationship of the system to all existing poles, utilities, sidewalks and other improvements within the public rights-of-way, and the facility or public property address;

(4)   The technical standards that the applicant proposes to follow in construction and operation of the telecommunications system;

(5)   A description of the telecommunications services to be provided;

(6)   The period of time the applicant intends to use the public property or rights-of-way;

(7)   Financial information;

(8)   A list of other jurisdictions in which the applicant operates or has operated a telecommunications system; and

(9)   Any additional information the County's application form may require.

Sec. 5A-152(a)(1)-(9). In addition, there is a $5,000

application fee. Sec. 5A-152(b).

Completed applications that "meet[] all the requirements of

the Division" then undergo a public hearing. Sec. 5A-152(d). At

that hearing, oral and written testimony and "any other relevant

material" may be presented for and against the application. Id.

The ordinance provides that, in evaluating a franchise

application, "the County may consider" the following factors:

(1)   The applicant's managerial, technical, financial and legal qualifications to construct and operate a telecommunications system on County property;

(2)   The nature of the proposed facilities, equipment, and services;

(3)   The applicant's recent performance record of

5

using public rights-of-way in providing
telecommunications services in other communities, if
any;
    (4)  Whether the proposal will serve and protect
the public interest;
    (5)  The effects of a grant of a franchise on the
use  of the public rights-of-way, including
consideration of the effect on current authorized users
of the rights-of-way; and
    (6)  Such other factors as the County may deem
relevant.

Sec. 5A-152(e)(1)-(6).  Based on these factors, the County

recommends either that a franchise be granted or that the

application be denied.  Sec. 5A-152(f).[7]  Even the County's

recommendation that a franchise be granted, however, is not the

end of the process.  The applicant and the county executive must

then negotiate a "franchise agreement."  Sec. 5A-152(g).

A franchise agreement sets forth the terms and conditions of

a telecommunications company's authorization (i.e., its

"franchise") to use the County's public rights-of-way.[8]  It is

not meant to replace any existing rules or regulations governing

the use of the County's roads and property, which remain in

---

[7]  The ordinance does not specify which County decisionmaker
will preside over the hearing or make this initial
recommendation.  Instead, the ordinance delegates to the county
executive the authority "to adopt regulations that are consistent
with this Division to administer and implement this Division."
Sec. 5A-166(b).

[8]  See Sec. 5A-153(b) ("A franchise authorizes use of the
public rights-of-way and those portions of public property
specifically designated in the franchise agreement . . ..").

6

effect.⁹ A franchise agreement must be agreed upon by the
parties "within ninety (90) days from the notice of the proposed
grant," otherwise "the notice of proposed grant shall become
void" and the process starts over. Sec. 5A-152(g).¹⁰ Once
agreed upon by the county executive, a franchise agreement
remains subject to the final approval of the county council.
Sec. 5A-152(h).¹¹ Until a franchise agreement between the County
and the applicant has been executed and approved, any franchise
granted by the County to a telecommunications company "shall not
become effective." Sec. 5A-153(a).¹² The maximum term of a
franchise agreement is 15 years, subject to renewal by the County
"in its sole discretion." Sec. 5A-153(a), (f).

Telecommunications companies whose franchises are not renewed by
the County may be required to remove their existing lines and
facilities at their own expense. See Sec. 5A-158(e).

_____

⁹ See Sec. 5A-153(g) ("The provisions governing any and all
other permits that may be required by the County shall still
apply and all other applicable fees are still due").

¹⁰ This period may be extended by the county executive for
an additional 90 days "for good cause." Sec. 5A-152(g).

¹¹ The ordinance requires that the county council register
its approval of a franchise agreement "by resolution." Sec. 5A-
152(i).

¹² In addition, the ordinance requires the applicant to pay
a "franchise acceptance fee in an amount not to exceed the
County's costs in considering the application, less the amount of
the filing fee," within 30 days of the date the grant of the
franchise is approved by the county council, otherwise "the grant
shall become void." Sec. 5A-152(j).

7

Each executed and approved franchise agreement must include the following terms and conditions:

     (1)   Insurance, bond and indemnification requirements;
     (2)   Requirements and conditions for construction in and use of the rights-of-way;
     (3)   A description of the type and location of the system facilities to be placed on public property or within the public rights-of-way;
     (4)   Reporting and record-keeping requirements, including financial audits and reconciliation of right-of-way charge payments; [and]
     (5)   Any other provision or requirement deemed necessary by the County.

Sec. 5A-153(d). In addition, the County expressly reserves the right, "to the extent permitted by law, to require a franchisee, as part of a franchise agreement, to provide telecommunications services, facilities, equipment and/or capacity for use to the County, at no charge to the County." Sec. 5A-154(d). Moreover, where the County deems it necessary, "for public purposes, to utilize the public property and/or rights-of-way that are occupied by a franchisee," the ordinance authorizes the County to require the franchisee, at its expense, to "remove any facilities and equipment within sixty (60) days . . . and restore the public property or rights-of-way to its original condition or to such comparable condition as may be requested by the County." Sec. 5A-153(c).

In addition to regulating which telecommunications companies may use the County's public rights-of-way and on what terms, the ordinance also imposes a 3% "right-of-way charge" on all

8

franchisees "for the privilege of using the public property

and/or public rights-of-way." Sec. 5A-154(a). This 3% charge is

levied on each franchisee's annual gross revenues. The ordinance

defines "gross revenues," in pertinent part, as

> all revenues derived directly or indirectly by the
> franchisee, its affiliates, subsidiaries, parent
> companies and any person in or with whom the franchisee
> has a financial interest, or revenues received by the
> franchisee from a person with whom the franchisee has a
> revenue-producing agreement, from the operation of the
> Telecommunications System in the designated franchise
> area . . . ..

Sec. 5A-150(a)(9).[13]  More specifically, the ordinance explains

that gross revenues "shall include, but not be limited to:"

> (A)  All gross revenues from local
> telecommunications services billed to a County address
> or account number or originating within the
> unincorporated area of the County;
> (B)  All gross revenues from long distance
> telecommunications services billed to a County address
> or account number or originating within the
> unincorporated area of the County;
> (C)  All gross revenues from telecommunications
> services levied on a usage or usage sensitive, mileage
> or flat rate basis;
> (D)  All gross revenues collected from connection
> or disconnection fees;
> (E)  All gross revenues from penalties or charges
> to customers for checks returned from banks, net of
> bank costs paid; all gross revenues from recoveries of
> bad debts previously written off, and revenues from
> sales of assignments of bad debts.  Unrecovered bad
> debts charged off after diligent, unsuccessful efforts
> to collect may be excluded from gross revenue
> computations;
> (F)  All gross revenues from the rental, lease or

---

[13]  Gross revenues received from a franchisee's provision of
universal telephone services in the county, pursuant to 47 U.S.C.
§ 254(c)(1), are exempt from this charge.  Sec. 5A-154(c).

sublease of any conduit space, or any portion of the
franchisee's telecommunications system, or any capacity
to other persons, whether or not owned in whole or part
by the franchisee, for the provision of
telecommunications services, including, but not limited
to, all gross revenue from local access fee charges;
    (G)  All other gross revenues from the provision
of   telecommunications services provided by the
franchisee within the County; . . .
    (J)  All gross revenues collected as a line item
or otherwise passed through to the consumer, including,
but not limited to, right-of-way charges.

Sec. 5A-150(a)(9)(A)-(G).

Under the ordinance, franchisees are required to pay their
right-of-way fees on a quarterly basis and must accompany their
payments with a financial statement "showing the franchisee's
gross revenues for the quarter in question." Sec. 5A-154(e).
They are also required to file with the County annual financial
statements that have been audited by a certified public
accountant. Sec. 5A-154(g). The County expressly reserves the
right "to audit and to recompute any amounts determined to be
payable under this Division." Sec. 5A-154(h). Furthermore, the
ordinance prohibits franchisees from "separately identify[ing]
the right-of-way charge on customer invoices or charg[ing] a
surcharge to customers within the County unless similar charges
for all other facilities rented by the person to provide
telecommunications services are similarly identified or charged."
Sec. 5A-154(k).

A franchisee's failure to comply with any of the provisions
of the ordinance or any of the terms or conditions of its

10

franchise agreement may lead to the revocation of its franchise
by the County. Sec. 5A-158(a). If the County revokes a
franchise, "the County may request the franchisee at the
franchisee's or surety's expense to remove its facilities and
equipment within sixty (60) days of the request and restore the
public property and rights-of-way to the County's
specifications." Sec. 5A-158(e).

Finally, the ordinance prohibits the "transfer of a
franchise, or a transfer of an interest in or control of a
franchisee or a franchise . . . without prior application to and
approval by the County." Sec. 5A-156(a).[14] The ordinance
defines the "transfer of a franchise" as "any transaction in
which:"

(A) An ownership or other interest in or control
of a franchisee or its telecommunications system is
transferred, directly or indirectly, from one person or
group of persons to another person or group of persons
so that actual working control of the franchisee's
telecommunications system is transferred; or
(B) The rights held by the franchisee under a
franchise agreement are transferred or assigned to
another person or group of persons.

Sec. 5A-150(a)(19)(A)-(B). The ordinance defines the "transfer
of an interest in a franchisee" as "the sale or transfer,
directly or indirectly, of an existing or newly created equity

_____

[14] This prohibition does not apply to "a transfer of an
interest to a person who already holds an ownership interest of
25 percent or more . . . if transfer of a franchise does not
occur." Sec. 5A-156(a).

11

interest in the franchisee that may or may not result in a transfer of control of the franchisee." Sec. 5A-150(a)(20). Thus, the ordinance imposes restrictions not only on the transferability of franchises granted by the County, but also on the transferability of shares of stock in franchisees doing business in Prince George's County.[15]

The effective date of the ordinance, which includes a severability clause, was January 4, 1999. (Compl. ¶ 17.)

## II.   Bell Atlantic's Lawsuit

Bell Atlantic instituted its lawsuit on December 23, 1998. In its complaint, Bell Atlantic states nine separate causes of action and requests declaratory and injunctive relief, as well as damages, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988(b).   The first three counts allege violations of the Contract Clause (Compl. ¶ 19-23), Commerce Clause (id. ¶ 24-29), and Due Process Clause (id. ¶ 30-36) of the United States Constitution.   The fourth count states a claim for relief under 42 U.S.C. § 1983 corresponding to those alleged constitutional violations. (Id. ¶ 37-53.)   Count five claims that the ordinance is preempted by the FTA and that it violates the FTA.   (Id. ¶

_____

[15]   See Sec. 5A-156(d) ("Before approving a transfer of an interest in a franchisee, the County may consider without limitation whether the transferee's interest will have any effect on the franchisee's operation of the system, the franchisee's qualifications, or the public interest").

12

62.) Count six alleges breach of contract against the County, (id. ¶ 63-67), and counts seven and eight state claims under the Maryland Declaration of Rights that correspond, respectively, to the federal Contract Clause and Due Process claims, (id. ¶ 74-75, 79). The ninth count asserts a violation of the Maryland Public Utility Companies Article. (Id. ¶ 81-93.)[16]

In response to the complaint, the County filed a motion to dismiss and Bell Atlantic responded. Amicus briefs were filed in support of Bell Atlantic's position by Sprint Communications Company, L.P., and AT&T Communications of Maryland, Inc., both of which also filed their own lawsuits at that time seeking to overturn the telecommunications franchise law.[17]

In its earlier opinion, this court found that the ordinance was preempted by § 253 of the FTA. Bell Atlantic, 49 F. Supp.2d at 820. Accordingly, the court permanently enjoined enforcement of the ordinance without addressing the other federal and state claims.[18] On appeal, the Fourth Circuit held that the court

---

[16] In addition to its complaint, Bell Atlantic filed a motion for preliminary injunction. This motion was rendered moot when the parties agreed to maintain the status quo ante pending the outcome of this case. See Bell Atlantic, 49 F. Supp.2d at 812.

[17] See Sprint Communications Co. v. Prince George's County, CCB-99-288, filed February 3, 1999; AT&T Communications, Inc. v. Prince George's County, CCB-99-465, filed February 18, 1999.

[18] The court also concluded that its holding mooted the lawsuits filed by AT&T and Sprint. (See CCB-99-288 and CCB-99-465, Memoranda and Orders issued August 23, 1999.) AT&T refiled

13

impermissibly "decid[ed] the constitutional question of preemption in advance of considering the state law questions upon which the case might have been disposed of . . .." <u>Bell Atlantic-Maryland, Inc. v. Prince George's County, Maryland</u>, 212 F.3d 863, 866 (4th Cir. 2000). <u>See also MediaOne Group, Inc. v. County of Henrico, Virginia</u>, __ F.3d __, No. 00-1680 (July 11, 2001). Therefore, it vacated the opinion and remanded the case with directions to evaluate the state law claims before reaching federal preemption.[19] The parties and amici submitted revised motions and supporting memoranda, and the Maryland Public

_____

its complaint after the Fourth Circuit's ruling, <u>see</u> CCB-00-2311; Sprint has not.

[19]While abiding by the ruling, the court respectfully disagrees with the Fourth Circuit's characterization of its original holding. Issues of federal preemption have not been thought to raise the kind of constitutional question that should be avoided under the rule espoused in <u>Ashwander v. Tennessee Valley Authority</u>, 27 U.S. 288, 56 S. Ct. 466 (1936). Although the Supremacy Clause necessarily was invoked to find the County ordinance preempted, the analysis undertaken did not involve an interpretation of the federal constitution, but rather a comparison of statutory language and intent. <u>See</u>, <u>e.g.</u>, <u>Douglas v. Seacoast Products, Inc.</u>, 431 U.S. 265, 271-72, 97 S. Ct. 1740, 1745 (1977) ("Although the [preemption] claim is basically constitutional in nature, deriving its force from the operation of the Supremacy Clause, . . . it is treated as "statutory" for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications."); <u>Swift & Co. v. Wickham</u>, 382 U.S. 111, 120, 86 S. Ct. 258, 263-64 (1965) ("The basic question involved in these cases, however, is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes."). <u>But see MediaOne</u>, No. 00-1680, slip op. at 11-12 (following <u>Bell Atlantic</u>). Nevertheless, as the Fourth Circuit's holding appears to prohibit this court from reaching federal preemption even as an alternate ruling, this opinion has been drafted accordingly.

14

Services Commission was permitted to file a brief as <u>amicus</u>
<u>curiae</u>, to which the County responded. The court interprets the
Fourth Circuit's directive as requiring it to consider the state
preemption, constitutional, and breach of contract claims first.
If it finds in favor of Bell Atlantic on any of those Counts, the
court need not reach federal preemption or the federal
constitutional claims raised in Counts I-IV. For the reasons
explained below, the ordinance is preempted by state law, and
therefore no other claims need to be addressed.

## STANDARD OF REVIEW

The Fourth Circuit has summarized the basic principles
governing the resolution of Rule 12(b)(6) motions:

> The purpose of a Rule 12(b)(6) motion is to test the
> sufficiency of a complaint; "importantly, [a Rule
> 12(b)(6) motion] does not resolve contests surrounding
> the facts, the merits of a claim, or the applicability
> of defenses." <u>Republican Party v. Martin</u>, 980 F.2d
> 943, 952 (4th Cir. 1992). Accordingly, a Rule 12(b)(6)
> motion should only be granted if, after accepting all
> well-pleaded allegations in the plaintiff's complaint
> as true and drawing all reasonable factual inferences
> from those facts in the plaintiff's favor, it appears
> certain that the plaintiff cannot prove any set of
> facts in support of his claim entitling him to relief.
> <u>See</u> <u>id.</u> . . . We do note, however, that for purposes of
> Rule 12(b)(6), we are not required to accept as true
> the legal conclusions set forth in a plaintiff's
> complaint. <u>See</u> <u>District 28, United Mine Workers of</u>
> <u>Am., Inc. v. Wellmore Coal Corp.</u>, 609 F.2d 1083, 1085
> (4th Cir. 1979).

<u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243-44 (4th Cir.

1999). Thus, the County's motion to dismiss under Rule 12(b)(6)

15

may not be granted unless, viewing the complaint in the light
most favorable to Bell Atlantic and accepting Bell Atlantic's
factual allegations, as well as all reasonable inferences
therefrom, as true, "it appears beyond doubt that [Bell Atlantic]
can prove no set of facts in support of [its] claim which would
entitle [it] to relief." Id.

The standard for granting judgment on the pleadings under
Rule 12(c) is similar to the standard for granting summary
judgment under Rule 56(c): whether, "when viewed in the light
most favorable to the party against whom the motion is made
[here, the County], no genuine issues of material fact remain and
the case can be decided as a matter of law." King v. Gemini Food
Servs., Inc., 438 F. Supp. 964, 966 (E.D. Va. 1976), aff'd, 562
F.2d 297 (4th Cir. 1977). See also Jablonski v. Pan Am World
Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1988) ("Under Rule
12(c), judgment will not be granted unless the movant clearly
establishes that no material issue of fact remains to be resolved
and that he is entitled to judgment as a matter of law.")
(internal quotation marks and citation omitted). Because the
parties do not disagree about any material facts and the outcome
depends upon pure questions of law, judgment on the pleadings is
appropriate.

16

ANALYSIS

In 1910, the Maryland General Assembly created a Public
Service Commission ("PSC") and granted it "jurisdiction over each
public service company that engages in or operates a utility
business in the State." Md. Code Ann. Pub. Util. Code § 2-
112(a). Telephone companies are explicitly included as "public
service companies." See id. § 1-101(w) (Supp. 2000). The PSC is
directed to:

- (i) supervise and regulate the public service
  companies . . . to
  1. ensure their operation in the interest of the
     public; and
  2. promote adequate, economical, and efficient
     delivery of utility services in the State
     without unjust discrimination; and
- (ii) enforce compliance with the requirements of law by
  public service companies, including requirements
  with respect to financial condition,
  capitalization, franchises, plant, manner of
  operation, rates, and service.

Id. § 2-113. In doing so, the PSC is granted all "implied and
incidental powers needed or proper to carry out its functions,"
and the statute directs that these powers "shall be construed
liberally." Id. §§ 2-112(b)(2), (c). Specifically, the PSC is
granted the authority to "adopt reasonable regulations" and to
"prescribe standards for safe, adequate, reasonable, and proper
service for any class of public service company." Id. §§ 2-121,
5-101(a).

Further, the PSC is given specific authority with respect to
state franchises. Although a franchise is granted by legislative

17

act, see Charles County San. Dist., Inc. v. Charles Utilities, Inc., 298 A.2d 419, 423 (1973), "[a] public service company may not exercise a franchise granted by law except to the extent authorized by the [PSC]." Md. Code Ann. Pub. Util. Code § 5-201(a). The PSC may not, however, authorize a company to exercise a franchise until that company files a statement asserting that the "appropriate local authorities" have consented to it. Id. § 5-201(a)(2). Also, a public service company may not "discontinue or abandon a service under a franchise," "assign, lease, or transfer a franchise or a right under a franchise" or "enter into any agreement or contract that materially affects a franchise or a right under a franchise" without permission from the PSC. Id. §§ 5-103(a)(2), 5-202. Finally, the companies are required to file with the PSC an annual report and any other reports it requires. Id. § 5-302.

Bell Atlantic contends that the County's ordinance is preempted by these state law provisions. "The doctrine of pre-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field." AD + Soil, Inc. v. County Commissioners of Queen Anne's County, 513 A.2d 893, 902 (Md. 1986). "[S]tate law may preempt local law in one of three ways:

18

1) preemption by conflict, 2) express preemption, or 3) implied preemption." Talbot County v. Skipper, 620 A.2d 880, 883 (Md. 1993) (citations omitted). See also AD + Soil, 513 A.2d at 902 ("Pre-emption may be accomplished either expressly by statutory language prohibiting local legislation, or impliedly, by other unequivocal conduct of the General Assembly.") (citations omitted). The Public Utilities law contains no express preemption provision. Thus, if the ordinance is preempted, it is by implication or as the result of a direct conflict with the statute.[20]

At the hearing, counsel for Bell Atlantic stated that his preemption argument was based on both implied preemption and the presence of a direct conflict. The arguments made at the hearing, in the parties' memoranda, and in the amicus briefs, however, focus on implied preemption. The court, therefore, addresses the direct conflict contention only briefly. "A local ordinance is preempted by conflict when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." Talbot County, 620 A.2d at 882 n.4. In their joint comments, Sprint and AT&T argue that only the PSC has the authority to

<hr>

[20]Moreover, because Maryland law, unlike the Virginia statute at issue in MediaOne, does not simply prohibit any "ordinance that is 'inconsistent . . . with federal law,'" state preemption provides an independent ground on which this case may be resolved. See MediaOne, No. 00-1680, slip op. at 13.

determine which telecommunications companies can provide service in the state. They contend that the ordinance allows the County to second guess that determination by deciding which companies can use its rights of way. (Joint Comments at 6.) When viewed together, the provisions of the ordinance cited by amici do not appear to prohibit any activity specifically permitted by the PSC or permit any prohibited activity. Rather, they create the impression of overlapping discretion, which is more appropriately addressed under the implied preemption analysis. See AD + Soil, 513 A.2d at 907-09 (finding that the zoning ordinance in question did not conflict irreconcilably with state law).

The most cogent argument in favor of a direct conflict is that the ordinance creates concurrent authority over the transfer of franchise rights. Both laws require approval from the governing body (either the PSC or County government) before a franchise, or right thereunder, can be transferred. Compare Md. Code Ann. Pub. Util. Code §§ 5-103(a)(2), 5-202 with Ordinance § 5A-156(a). Accordingly, a situation might arise in which the state agency approves or disapproves a transfer, and the County does the opposite. The court declines the invitation to analyze these potentially conflicting provisions because it finds the entire ordinance impliedly preempted by the grant of authority to the PSC. Thus, rather than separately evaluating the control over franchises given to the state agency and that taken by the

local government in an effort to determine which provisions of
the ordinance may be in direct conflict with state law, the court
will examine the ordinance in its entirety.

"Generally, state law preempts by implication local law
where the local law 'deal[s] with an area in which the [State]
Legislature has acted with such force that an intent by the State
to occupy the entire field must be implied.'" Talbot County, 620
A.2d at 883 (quoting County Council v. Montgomery Ass'n, 333 A.2d
596, 600 (1975)).  See also Baltimore v. Sitnick, 255 A.2d 376,
385 (Md. 1969) ("there may be times when the legislature may so
forcibly express its intent to occupy a specific field of
regulation that the acceptance of the doctrine of preemption by
occupation is compelled . . ..").  While "[t]here is no
particular formula for determining whether the General Assembly
intended to preempt an entire area," Talbot, 620 A.2d at 883,
"the focus of the inquiry must be on whether the General Assembly
has manifested a purpose to occupy exclusively a particular
field," AD + Soil, 513 A.2d at 902 (citation omitted).  Further,
"the primary indicia of a legislative purpose to pre-empt an
entire field of law, absent express statutory language to this
effect, is the comprehensiveness with which the General Assembly
has legislated in the field."  Id. at 904.

Bell Atlantic and amici claim that the ordinance
impermissibly infringes on the comprehensive telecommunications

21

regulatory scheme established by the state. In response to a question from the bench, counsel for the County conceded at oral argument that the state government had occupied entirely the regulation of telecommunications companies.[21]  The County, however, disputes the contention that the ordinance attempts to regulate in that field. Rather, it argues that preemption is inappropriate because the County has sought to regulate its rights of way, not to interfere with the regulatory authority granted to the PSC to control telecommunication companies. (See County's Reply to Amicus Brief at 2-3, arguing that the PSC has no jurisdiction over the physical rights of way.) The County is explicitly granted the authority in its charter to grant rights and franchises related to its rights of way, and to manage its roadways.[22]  It contends that the franchise application and

---

[21]  The Maryland Court of Appeals has opined that, in creating the PSC, "the legislature created comprehensive and detailed administrative machinery for the regulation of public utilities throughout the state." Splintman v. Chesapeake and Potomac Telephone Co. of Maryland, 255 A.2d 304, 306 (Md. 1969). Further, according to that court, the purpose of the Act "was to place all corporations handling public utilities under the supervision and control of the Public Service Commission . . .." Gregg v. Laird, 87 A. 1111, 1114 (1913). See also Howard County v. Potomac Electric Power Co., 573 A.2d 821, 828 (Md. 1990) ("it is clear that, in the field of public utility service, the General Assembly intended to grant broad powers to the PSC . . .."). Thus, the County's concession aside, case law demonstrates that the broad grant to the PSC of jurisdiction and regulatory authority constitutes a comprehensive scheme sufficient to warrant preemption.

[22]As a Maryland home-rule county, the County has been authorized by the state legislature to exercise the powers set

22

information requested therein are necessary for the County to manage its rights of way independent of the corporate characteristics of the telecommunications companies. (County's Reply to Amicus Brief at 4-9.) The County also argues that the fee portion of the ordinance is not improper because the PSC cannot interfere with the rent it chooses to charge for use of its rights of way. (County's Reply to Amicus Brief at 4.)

Thus, the question of preemption by state law depends on a characterization of the ordinance. If the ordinance simply regulates the rights of way in the County, it would follow that the ordinance was a valid exercise of County authority and not preempted by Maryland law. Upon analysis, however, it appears that the ordinance - in particular the application process and required submissions - exceed the scope of mere right of way regulation.

In its earlier opinion, the court found that the regulatory authority granted to the County in the ordinance exceeded that

---

forth in Article 25A, section 5, of the Annotated Code of Maryland of 1957. That section provides the County with the authority

> to grant any franchise or right to use the same, or any right or franchise in relation to any highway, street, road, lanes, alley or bridge; to grant one or more . . . franchises for a community antenna system or other cable television system that utilizes any public right-of-way highway, street, road, lane, alley, or bridge, to impose franchise fees, and to establish rates, rules, and regulations for franchises granted; . . ..

Md. Code Ann. Art. 25, § 5(B).

23

necessary to manage the rights of way, explaining:

> First, the ordinance requires telecommunications
> companies to supply information to the County that is
> not directly related to the County's management of its
> rights-of-way.  For example, the application form
> requires telecommunications companies to provide
> undefined "financial information" as well as
> information about "other jurisdictions" in which the
> companies operate.  Sec. 5A-152(a)(7)-(8).  The
> application form also requires telecommunications
> companies to provide information about the "technical
> standards" that the companies intend to follow in
> operating their telecommunications systems and "[a]ny
> additional information" that the County may request.
> Sec. 5A-152(a)(4), (9).
>     Most objectionable is the fact that the ordinance
> vests the County with complete discretion to grant or
> deny a franchise application based on a wide-ranging
> set of factors that include the applicant's
> "managerial, technical, financial, and legal
> qualifications to construct and operate a
> telecommunications system on County property" and
> "[w]hether the proposal will serve and protect the
> public interest."  Sec. 5A-152(e)(1), (4). . . . .  In
> addition, the ordinance provides no criteria to guide
> the county executive in carrying out his or her
> responsibility to negotiate franchise agreements, see
> Sec. 5A-152(g), and permits the County to refuse to
> renew franchises "in its sole discretion," Sec. 5A-
> 153(f).  Based on these and other similar provisions,
> the court agrees with Bell Atlantic that the ordinance
> "regulates providers of telecommunications services in
> the most comprehensive and utterly discretionary
> fashion," Pl.'s Opposition, p. 7, and that this far
> exceeds the County's authority "to manage the public
> rights-of-way". . . .

Bell Atlantic, 49 F. Supp.2d at 816-17.

At oral argument and in its memoranda, the County has
attempted to justify, as a valid exercise of its authority to
regulate rights of way, the requirements and discretion that the
court found objectionable in its earlier opinion.  At the

24

hearing, counsel for the County grouped these justifications into three categories. First, he argued that the financial information is required by the County to ensure that the company can complete construction or repair projects it undertakes. He contended that unfinished projects are a safety hazard that the County must prevent. (County's Mem. in Resp. to PSC Amicus Brief at 7-8.) Second, he justified the franchise requirement as a way in which the County could be certain that it knew the current identity of each provider using each right of way so that the County could easily contact that company in the event of a mishap. (Id. at 9.) Finally, the County claims to have the authority to control transfers of franchises in order to ensure that the transferee company has the financial ability to complete the project it seeks to undertake and in order to be certain which companies are using which rights of way. (Id.)

These contentions are not persuasive. First, the information required under the ordinance must be submitted by all telecommunications companies seeking to use the telephone lines in Prince George's County, not only those companies actually engaged in new construction or repair. See Ordinance § 5A-151(e) ("No person shall provide a telecommunications service through facilities owned, maintained or operated by any person upon, across, beneath, or over any public right-of-way in the County without obtaining a franchise therefor."). Second, Prince

George's County has already passed a series of provisions intended to "promote the safety and welfare of the citizens of the County by . . . assur[ing] the provision of adequate and safe roads in connection with the development of, or construction upon, adjacent or nearby lands." (Mem. Opp. Mot. to Dis., Ex. C., Prince George's County Code, Subtitle 23 § 23-101(b).) Those provisions require utility companies, including telephone companies, "to apply for and obtain a permit from the Department for all work performed within the public right-of-way related to repair or modification of their systems." (Id. § 23-120(a).) Thus, the County already has a series of regulations in place by which it maintains the safety of its rights of way. That system is further evidence that the new ordinance is properly construed as an attempt to regulate the telecommunications companies.

Finally, in regard to transfers, the telecommunications companies argue that only the PSC has the authority to review a company's qualifications to provide telecommunications services when evaluating a franchise. Indeed, they contend that "[d]etermining whether a particular entity is fit to provide the telecommunications service is a decision that rests solely with the [PSC]." (PSC Amicus Brief at 8-9; Joint Comments at 6.) In its amicus brief, the PSC details the certification process it undertakes when deciding whether to approve a franchise that has been granted. (PSC Amicus Brief at 2-6.) This review, they

26

argue, would be undermined if the County were permitted to determine independently which companies could use its rights of way. Thus, they assert that the provisions of the ordinance giving the County authority to review the qualifications of prospective franchisees are preempted because the state has explicitly given the PSC sole authority to determine which telecommunications companies may operate in the state.

This argument is parallel to the one accepted by the Maryland Court of Appeals in Howard County v. Potomac Electric Power Co., 573 A.2d 821 (Md. 1990). In that case, the court found that local zoning ordinances related to high voltage power lines were preempted by Maryland public utilities law. Although the PSC is given final authority over construction permits for high voltage power lines, state zoning ordinances are not expressly preempted. See id. at 827. Thus, Howard County attempted to use a zoning ordinance to require a telephone company to obtain additional permits after it received PSC approval. The court concluded that "allowing counties to require special permits of utility companies even when they qualify for a certificate from the PSC would sanction an authority superior to that of the PSC. In such cases the statutory powers of the PSC would effectively be bridled if its decisions contravened the actions of local bodies." Id. at 830. In reaching that decision, the court found important the likelihood that different

27

counties might have different standards and might act in a manner "antithetical" to the interests of the state as a whole.  Id. That, the court concluded, is one reason the permitting authority was granted to one statewide agency.  The court's rationale applies equally to the County's desire in this case to approve, refuse, and regulate franchises.[23]

In sum, the court finds that the ordinance is an impermissible attempt by the County to regulate telecommunications.  Because Maryland has demonstrated a clear intent to occupy that entire field, the ordinance is impliedly preempted.[24]

---

[23]  The companies cite cases from other state and federal jurisdictions in which courts have found that a city may require a telecommunications company "to obtain a franchise in order to use City rights-of-way . . . [but] may not, however, condition this franchise on anything other than [the company's] agreement to comply with the City's reasonable regulations of its rights-of-way and the fees for use of those rights-of-way [and may not] require a wide-ranging franchise application . . .."  AT&T Communications of the Southwest v. City of Dallas, 8 F. Supp.2d 582, 586 (N.D. Tex. 1998).  See also Joint Comments at 7 (listing four cases that have accepted this proposition).  Those cases, however, are based on interpretations of relevant state law.  The court did not undertake a comparison of those laws with the Maryland Public Utility Code because it found reliance on those holdings unnecessary.

[24]Further, to the extent that the County might argue that certain provisions of the ordinance are severable, the court finds that the stated purpose of the ordinance could not "largely be carried out" without those provisions that are impliedly preempted by state law.  See Board of Supervisors of Elections of Anne Arundel County v. Smallwood, 608 A.2d 1222, 1234-35 (Md. 1992); O.C. Taxpayers for Equal Rights, Inc. v. Mayor and City Council of Ocean City, 375 A.2d 541, 550 (Md. 1977).

28

In light of its conclusion that the ordinance is preempted under state law, the court finds it unnecessary to reach the constitutional and other claims that involve difficult and sensitive areas of state law.[26]

A separate Order follows.

_July 23, 2001_
       Date

_____
       Catherine C. Blake
United States District Judge

---

[5]The court's suggestion that these issues be certified to the Maryland Court of Appeals was declined by the parties.

29